IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ARVELL IRISH and LESLIE MOORE, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 10 C 7265 |
| | ) | |
| JEWEL FOOD STORES, INC., | ) | |
| an Ohio corporation, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, Chief Judge:

On November 11, 2010, Arvell Irish and Leslie Moore filed a complaint (Dkt. No. 1) alleging that their employer Jewel Food Stores, Inc. ("Jewel") is liable under 42 U.S.C. § 1981 for discriminating against them on the basis of race by subjecting them to a hostile work environment. Pending before the court is Jewel's Motion for Partial Summary Judgment (Dkt. No. 59), seeking to dismiss Irish and Moore's claim that they are entitled to punitive damages. For the reasons listed below, Jewel's motion is denied.

BACKGROUND

Arvell Irish and Leslie Moore are both African-Americans who work as janitors at Jewel's Distribution Center in Melrose Park, Illinois. (Dkt No. 61 ("Def.'s SMF") ¶ 3.) Janitors are supervised by maintenance supervisors. (*Id.* ¶ 10.) At the time of the incidents at issue in this case, the maintenance supervisors over Irish and Moore were Ronald Alphonse, Jerry Richmond, Walter Crenshaw, Mohammed Khan, Ron Pezdek, and Dave Spankroy. (*Id.* ¶¶ 10-12; Dkt No. 92 ("Pl.'s SMF") ¶ 7.) The maintenance supervisors reported to Curtis Maddin, who reported to Mark

1

Michonski. (Def.'s SMF ¶ 13.) Michonski has the authority to hire and fire janitors in consultation with other managers. (*Id.*)

Jewel submitted the affidavit of Dennis Dwyer, the Association Relations Manager at the Melrose Park Distribution Center, which states that maintenance supervisors have no authority to hire or fire employees, and that they may not discipline employees except for issuing attendance points for poor attendance in accordance with company policies, and with no exercise of discretion. (*Id.* ¶¶ 14-15.) Irish and Moore deny that the authority of maintenance supervisors is so limited, and cite incidents in which maintenance supervisors responded to complaints of harassment by stating that they would take care of it. (Dkt. No. 92 ("Pl.'s Resp. to Def.'s SMF") ¶ 15.) They also submitted evidence that Richmond once sent an employee home, and that Crenshaw once "wrote up" Moore for spending too long on a smoke break. (Pl.'s SMF ¶ 7.)

Jewel maintains policies prohibiting harassment and discrimination, (Def.'s SMF ¶¶ 15-16), and its employees receive periodic training in the terms of those policies, (*Id.* ¶¶ 19-20). The policies instruct employees to report any concern of harassment or discrimination, first to their immediate supervisor, then to the Department Manager, and lastly to the Facility Manager, to the Human Resource Department, or to Jewel's anonymous toll-free complaint Hotline. (*Id.* ¶ 18; Pl.'s SMF ¶ 10.) Irish and Moore were both aware of the Hotline. (Def.'s SMF ¶ 22.)

This action involves several incidents in which Irish and Moore allege that their fellow janitors racially harassed them. In one incident, Irish heard fellow janitor Wilfredo Soto, who is Hispanic, say that he "hates working with these dumb niggers." (*Id.* ¶ 33; Def.'s Ex. 2, at 54.) Soto was referring to African-American employees of another company that unloaded trucks for Jewel. (Def.'s Ex. 2, at 54-55.)

2

In another incident in the spring of 2006, Irish heard Soto say "she looked like a spook." (Def.'s SMF ¶ 34.) Although Irish asserted that he believed that Soto was speaking of a black female janitor, he stated that his back was turned and he did not hear who Soto was referring to. (*Id.*; *see also* Def.'s Ex. 2, at 73-76.) Irish reported the incident to a maintenance supervisor. (Def.'s SMF ¶ 34.)

In early 2008, Irish heard Soto say "lazy niggers" in the locker room while laughing and talking in Spanish with Jaime Guzman, another Hispanic janitor. (*Id.* ¶¶ 4, 35.) Irish reported the incident to Richmond, who said he would take care of it and later told Irish that he had spoken to Soto about his behavior. (*Id.* ¶ 35.) Moore also recalled an incident in which he and Irish were called "lazy niggers," but he recalled that Guzman, not Soto, made the comment. (*Id.* ¶ 38.) Moore reported that incident to Richmond and Alphonse. (*Id.*) Guzman denies ever calling anyone "lazy niggers." (*Id.*) Two weeks later, Irish saw Soto sabotage his work area by poking holes in a soap dispenser. (Pl.'s SMF ¶ 16.) Irish reported the incident to Richmond, who said he would talk to Soto. (*Id.*; *see also* Pl.'s Ex. 1, at 93.)

Later in 2008, Moore heard Soto and Guzman speaking in Spanish and reported that when Moore and Irish turned around, Soto and Guzman started laughing. (Def.'s SMF ¶ 36.) Moore believed that Soto and Guzman had been making racial comments about him. (Def.'s Ex. 3, at 94.) Moore told Richmond that they were "messing" with him, and Richmond later told Moore that he had spoken with Guzman and Soto, who denied that they were talking about Moore and Irish. (Def.'s SMF ¶ 36.)

A few days later, Guzman sprayed Moore with the overspray from a power washer, and continued to do so after Moore asked him to stop. (*Id.* ¶ 37.) Moore reported the incident to

3

Richmond, who spoke to Guzman about it. (*Id.* ¶ 38.) A few months later, Guzman again sprayed Moore while power washing, causing Moore's gloves to get soaked. (*Id.* ¶ 39.) After Moore had already gotten another pair of gloves, Guzman approached him, said "[y]ou say Guzman take your gloves?" and threw a pair of gloves at Moore, hitting him in the chest. (*Id.*). Moore reported the incident to Alphonse and Richmond, and suggested to them that they report the incident to Maddin and Michonski. (*Id.*) Alphonse and Richmond told Moore that it didn't need to go any further, because Moore and Guzman could both lose their jobs. (*Id.*)

In the fall of 2008, someone poured ammonia into the urinals that Irish was supposed to clean. (*Id.* ¶ 40.) Irish told Richmond and Khan that someone had sabotaged his work area, and that he believed it to be Soto. (*Id.*) Later, Soto said, "lazy black ass, black snitch" to Irish as they passed each other, an incident Irish also reported to Richmond. (*Id.*) Irish does not know if Richmond did anything in response to this incident. (Pl.'s SMF ¶ 17.)

A few months later in early 2009, Irish heard Guzman tell Moore to "shut up and stop crying like a little bitch." (*Id.* ¶ 18.) Irish and Moore reported the incident to Alphonse, who spoke to Guzman and told him to stop. (*Id.*; Pl.'s Ex. 1, at 118.) Also in early 2009, Irish heard Soto tell Richmond that he wasn't going to work on a particular cleaning project because "you don't make Irish black ass do it." (Def's SMF ¶ 41.) Later, Irish heard Soto say to Guzman in response to another assignment that "[t]hey never make the black guys do it." (*Id.* ¶ 42.) In another incident, Irish heard Soto refer to a former janitor and say "that black bitch don't get made to do no work." (*Id.* ¶ 43.) Irish reported the incident to Alphonse or Khan. (*Id.*)

A few weeks later, Irish heard Soto call a female African American janitor a "black bitch." (Pl.'s SMF ¶ 19.) Irish reported the incident to Alphonse or Khan. (*Id.*) Shortly thereafter, Irish

4

overheard Soto in the coffee room saying "Irish dumb black ass didn't make no coffee" and calling Irish a "black dumb nigger." (Def.'s SMF ¶ 44.) Irish reported the incident to Richmond and Alphonse, who told Irish to ignore Soto and that they would take care of it. (*Id.*) Richmond and Alphonse also warned Irish not to complain to Maddin because it might create a bigger problem, and because Irish might be punished. (Pl.'s SMF ¶ 19.) A few weeks later Irish heard Guzman call him "a lazy black monkey" and reported the incident to Richmond. (Def.'s SMF ¶ 45.) Two weeks thereafter, Irish overheard Soto telling Guzman in the cafeteria not to pick up a piece of trash because "one of the slaves will pick it up anyway." (*Id.* ¶ 46.) Irish reported the incident to Richmond. (*Id.*)

A month later, Irish stated that Soto again called him a "black nigger," which Soto reported to Alphonse. (*Id.* ¶ 47.) Alphonse told Irish to ignore Soto. (*Id.*) Around Christmas of 2009, Soto said to Irish and a group of coworkers discussing Christmas gifts that "[y]ou know niggers can't afford Christmas gifts." (*Id.* ¶ 48.) Irish reported the incident to Richmond and Alphonse. (*Id.*) Richmond told Irish that Maddin and Michonski were aware of what was going on in the department. (Pl.'s SMF ¶ 23.) Alphonse told Irish to leave things alone so that he wouldn't lose his job. (*Id.*)

In March of 2010, Irish heard Soto and Guzman speaking in Spanish, laughing, and saying "mono" and "lazy" in English. (Def.'s SMF ¶ 49.) In April 2010, Moore found graffiti that said "mona" or "monkey" on his locker and reported the incident to Alphonse and Richmond. (Pl.'s SMF ¶ 31.) In July 2010, Moore found a banana peel in front of his locker and complained to Richmond. (Def.'s SMF ¶ 50.) Also in July 2010, Irish and Moore found graffiti on their lockers including the terms "mona," "negro," and "puerco." (*Id.* ¶ 52.) Irish and Moore reported the graffiti to Richmond

5

and to Jewel's complaint Hotline. (*Id.* ¶¶ 52, 53.) The complaints led to an investigation by Buvern Francisco, Jewel's Loss Prevention Manager. (*Id.* ¶¶ 53-56.)

In October 2010, Irish returned from a smoke break and found Guzman's lunch trash on the table where he had been sitting. (*Id.* ¶ 57.) Thereafter, Guzman called Irish a "lazy nigger." (*Id.*) Irish complained to Alphonse and Richmond, who contacted Francisco. (*Id.*) Francisco initiated an investigation of the incident. (*Id.*) Dawn Regnier interviewed Guzman and learned that he denied leaving trash on the table or calling Irish a nigger, and that he claimed that Irish and Moore called him "Taco Bell." Regnier advised Irish, Moore, and Guzman to stay away from each other. (*Id.*)

In November 2010, Irish filed a Hotline complaint against Guzman, claiming that Guzman had falsely reported Irish for sabotaging Guzman's work area and that Guzman had called Irish "a lazy black." (*Id.* ¶ 58.) Francisco investigated the complaint. (*Id.*) Finally, in January 2011, Guzman and Soto started laughing after passing Irish in the lunch room. (*Id.* ¶ 61.) Irish complained to Alphonse, who told Maddin. (*Id.*) Francisco again investigated the complaint.

In addition, there were other incidents in which Guzman called Moore racial epithets such as "monkey," "nigger," and "mona." (Pl.'s SMF ¶ 33.) Guzman also once sabotaged Moore's work area, which Moore reported to Alphonse. (*Id.* ¶ 34.)

In each instance when Jewel investigated Irish and Moore's complaints, the investigative report was "given to the Associate Relations Department for review" (Def.'s Ex. 8, Attach. J, M, N), or referred to Security for a further investigation (*Id.* Attach. K, L). There is no evidence of further action by the Associate Relations Department or by Security. (Def.'s Ex. 8, Attach. J-N.)

## LEGAL STANDARD

A grant of summary judgment is proper "if the movant shows that there is no genuine dispute

6

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "There is no genuine issue of material fact when no reasonable jury could find in favor of the nonmoving party." *Brewer v. Bd. of Trs. of the Univ. of Ill.*, 479 F.3d 908, 915 (7th Cir. 2007). When ruling on a motion for summary judgment, the court must consider the facts before it in the light most favorable to the nonmoving party, drawing all reasonable inferences in the nonmoving party's favor. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010).

## ANALYSIS

Jewel contends that it is entitled to summary judgment on the issue of punitive damages because the evidence does not support a punitive damages award. Section 1981a(b) provides that punitive damages are available in a claim under § 1981 "if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b). Courts have distilled a three-part test from § 1981a(b), requiring the plaintiff (1) to "demonstrate that the employer acted with the requisite mental state," and (2) to show "that the employees who discriminated against him are managerial agents acting within the scope of their employment." *Hertzberg v. SRAM Corp.*, 261 F.3d 651, 661-62 (7th Cir. 2001) (citations and quotation marks omitted). If the plaintiff is successful, the defendant can still avoid punitive damages by showing (3) "that it engaged in good faith efforts to implement an antidiscrimination policy." *Id.*

Jewel contends that Irish and Moore are not entitled to punitive damages because the maintenance supervisors to whom they reported most of the incidents are not managerial employees.

7

Moreover, Jewel contends that when Irish and Moore did report incidents to higher-level management, the complaints were handled appropriately, indicating that Jewel engaged in a good faith effort to implement an antidiscrimination policy. The court will address each argument in turn.

I. The Status of Maintenance Supervisors

On the first point, determination of which employees are managerial "is necessarily a fact-intensive inquiry driven by the kind of authority the employer has given the employee, the amount of discretion given to the employee in executing his job duties, and the manner in which those duties are carried out." *Id.* at 663 (citation and quotation marks omitted). To be a managerial employee, "an employee must be 'important,' but perhaps need not be the employer's 'top management, officers, or directors,' to be acting 'in a managerial capacity.'" *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 543 (1999) (citation omitted).

Jewel has submitted the affidavit of Dennis Dwyer, the Association Relations Manager at Jewel's Melrose Park Distribution Center, which indicates that maintenance supervisors have no authority to hire or fire employees, that they have no disciplinary authority except in the area of attendance, and that even that authority is not discretionary. (Def. SMF ¶ 14-15.) Irish and Moore dispute those assertions, contending that maintenance employees have authority to send employees home or to write them up for disciplinary infractions.

The evidence that Irish and Moore have submitted does not support their assertions, however. Irish and Moore point to evidence that Crenshaw wrote up Moore when he spent too long on a smoke break, but Crenshaw's action is consistent with Jewel's assertions that maintenance supervisors had authority to discipline employees for attendance infractions. Irish and Moore also contend that Richmond once sent Soto home for disciplinary reasons. Richmond's actual testimony,

8

however, indicates that he asked Soto to do a certain task or to go home, and that when Soto left, Richmond gave him attendance points for leaving when he was not supposed to. (Def.'s Ex. 1, at 36.) Richmond's testimony indicates that he was not formally disciplining Soto beyond the issuance of attendance points, an area in which Jewel admits maintenance supervisors had authority. Finally, Irish and Moore point to the statements of maintenance supervisors in response to complaints of harassment that they would "take care of it." (Pl.'s SMF ¶ 7.) The maintenance supervisors did not say that they would "take care of it" through formal discipline, however. They may have meant only that they would report the harassment to their superiors, not that they would administer discipline themselves. Accordingly, there is no evidence that maintenance supervisors had authority to discipline employees beyond the limited area of attendance, and there is no dispute that they lacked authority to hire or fire employees.

Courts have found those factors significant indications that an employee is not managerial. *See Hertzberg*, 261 F.3d at 663 (finding that an employee who "had little discretion in hiring, disciplining or terminating employees that reported to him" is not managerial). Here, however, Irish and Moore contend that the maintenance supervisors had additional authority to receive complaints of harassment, and that their authority in that area makes them managerial employees. In support, they note that Jewel's harassment policies instruct employees to report problems first to their immediate supervisor. (Pl.'s SMF ¶ 10.) From that fact, they infer that maintenance supervisors, who are the immediate supervisors of the janitors, had authority to handle those complaints.

Irish and Moore's reasoning is incorrect, however, because three maintenance supervisors testified that, when they received complaints, their obligation was to report those complaints to upper-level management. (Pl.'s Resp. to Def.'s SMF ¶ 19.) Accordingly, Jewel's requirement that

9

employees report complaints first to their immediate supervisor does not indicate that those immediate supervisors necessarily had authority to resolve those complaints or to discipline employees themselves. Instead, at least in the case of the maintenance supervisors, the immediate supervisor was to report the complaint to upper-level management. Accordingly, there is no evidence that the maintenance supervisors exercised significant discretionary authority in the area of receiving harassment complaints. Jewel is thus correct that there is no genuine dispute of material fact that the maintenance supervisors are not managerial employees.

II. Jewel's Response to Plaintiffs' Complaints to Upper-Level Management

On the second point, Jewel contends that it acted in good faith to implement a written harassment policy, that it instructed its employees on that policy, that it maintained a complaint procedure, and that all of Irish and Moore's complaints submitted to upper-level management through that procedure were appropriately investigated. Nonetheless, "although the implementation of a written or formal antidiscrimination policy is relevant to evaluating an employer's good faith efforts at Title VII compliance, it is not sufficient in and of itself to insulate an employer from a punitive damages award." *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 858 (7th Cir. 2001). Accordingly, to escape liability, a "[d]efendant must not only develop anti-discrimination policies, but must also show the active enforcement of its mandate." *E.E.O.C. v. Caterpillar Inc.*, 503 F. Supp. 2d 995, 1049 (N.D. Ill. 2007) (citation and quotation marks omitted). As the Tenth Circuit put it,

> even if an employer-defendant adduces evidence showing it maintains on paper a strong non-discrimination policy and makes good faith efforts to educate its employees about that policy and Title VII, a plaintiff may still recover punitive damages if []he demonstrates the employer failed to adequately address Title VII violations of which it was aware.

10

*Cadena v. Pacesetter Corp.*, 224 F.3d 1203, 1210 (10th Cir. 2000)

Here, Jewel at least began to enforce its policies by implementing investigations of each of Irish and Moore's complaints. Those investigations, however, did not lead to any disciplinary action against the offending employees. (Def.'s Ex. 8, Attach. J-N.) Moreover, the evidence indicates that the harassment continued even after the investigations and after Jewel's upper-level management was aware of the complaints. (*See* Pl.'s SMF ¶¶ 20, 23.) Specifically, both Maddin and Michonski were aware of the racial tension among the janitors as early as December 2009, and yet there is no evidence that they took any action to address the situation. (*See id.* ¶ 23.) Even assuming that, as Jewel contends, the investigations could not have proceeded further because the evidence was inconclusive and the witnesses disputed the relevant facts, a jury could reasonably find that Jewel's upper-level management should have taken additional action to address the recurring problems among the janitors. Accordingly, a jury could reasonably find, if the evidence in the record is offered and admitted at trial, that Jewel's investigations of the complaints were inadequate to enforce its antidiscrimination policies and that they do not establish that Jewel acted in good faith.

## CONCLUSION

Jewel's Motion for Leave to File *Instanter* Its Reply (Dkt. No. 106) is granted. For the reasons stated above, Jewel's motion for partial summary judgment (Dkt. No. 59) is denied. The parties are each requested to submit by noon on February 23, 2012, a proposed modification to the punitive damages jury instruction to instruct the jury on the standard it should use to identify Jewel's managerial employees. Consistent with the court's ruling on Jewel's motion for partial summary judgment, the instruction should state that maintenance supervisors are not managerial employees. The parties are also requested to submit by that time a special interrogatory for the jury to answer

identifying Jewel's managerial employees, if the jury finds that an award of punitive damages is appropriate.

ENTER:

_____
JAMES F. HOLDERMAN
Chief Judge, United States District Court

Date: February 22, 2012